ROY H. AND MARY L. OSTERHOUT, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Osterhout v. Commissioner
Docket Nos. 18714-85, 21489-85, 21727-85, 38088-85, 19262-86, 19904-86, 25184-86, 43065-86, 12259-87, 13367-87, 13686-87, 16092-87, 19972-88, 21522-88
United States Tax Court
T.C. Memo 1993-251; 1993 Tax Ct. Memo LEXIS 254; 65 T.C.M. (CCH) 2878; June 7, 1993, Filed *254 Decision will be entered under Rule 155. For petitioners: Robert B. Martin, Jr., Boyd D. Hudson, and John R. Deacon. [2]
For respondent: Jack Klinghoffer, Linette Angelastro, and Robin Kaufer. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: These cases were consolidated for trial, briefing, and opinion and assigned to Special Trial Judge Larry L. Nameroff pursuant to section 7443A(b) of the Code [3] and Rules 180, 181, and 183. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE NAMEROFF, Special Trial Judge: For petitioners before us who are not Tax Matters Partners (TMP), respondent determined deficiencies *255 in income tax, additions to tax, and additional interest for 1980, 1981, 1982, and 1983 in the following amounts: Additions to Tax
Year
Docket No.
Deficiency Sec. 6653(a)(1)
[5] Sec. 6659 Sec. 6661
Sec.
6621
ROY H. AND MARY L. OSTERHOUT
1980
43065-86
$ 756.00    [1] $ 37.80    *256 --     --
[4]
1981
18714-85
23,128.68
[2] 1,156.43
$ 6,938.60  --
[4]
1982
25184-86
7,598.00
[2] 379.90
2,279.40
$ 2,171.30
[4]
KAREN G. KUSTER 1981
21522-88
$ 17,137    [2] $ 857.00   $ 5,141.00  --
[4]
1982
21489-85
19,203   [2] 960.15
5,760.90
[3] [4]
1983
16092-87
16,653   [2] 832.65
3,215.40
--
[4]
DON A. AND JANE A. KUSTER 1981
38088-85
$ 125,696   [2] $ 6,285.00 $ 37,709.00 --
[4]
1982
21727-85
221,220   [2] 11,061.00
66,366.00
[3] [4]
V.E. KUSTER CO., INC. FY
6/30
1980
19972-88
$ 560,465   [1] $ 28,023.00
$ 168,140.00
[3] [4]
1981
19972-88
29,651   [1] 1,483.00
--   --
--
1982
19972-88
1,802,744   [2] 90,146.00
540,823.00
--
[4]
1983
19972-88
306,880   [2] 15,344.00
91,741.00
[3] [4]
In Notices of Final Partnership Administrative Adjustments (FPAA), respondent determined adjustments to ordinary income as follows: MESERVE DRILLING PARTNERS Year
Docket
Adjustment to Ordinary Income
1982
19262-86
$ 1,228,560
1983
19262-86
171,721
COLUMBIA ENERGY FUND 1982 1982
19904-86
$ 3,176,180
1983
19904-86
1,059,673
MESMUHU ENERGY PARTNERS, LTD. 1983
12259-87
$ 259,933  DRAKE ENERGY FUND 1983
1983
13367-87
$ 1,946,842
BALBOA ENERGY FUND 1981 1983
13686-87
$ 62,752   These cases are part of a tax litigation *257 project referred to as Mar Oil. The project included over 2,500 docketed cases and over 300 different oil and gas partnerships, the common thread among them being a provision in the promotional materials regarding the deduction for income tax purposes of an accrued minimum annual royalty (MAR). In Heitzman v. Commissioner, T.C. Memo. 1987-109, affd. 859 F.2d 783 (9th Cir. 1988), we decided that the MAR was not an allowable deduction in the year accrued. Heitzman was supposed to have been the test case in the Mar Oil litigation project. However, it did not resolve all the issues, although most of the 2,500 docketed cases in the Mar Oil project were subsequently resolved by settlement. Petitioners herein concede that Heitzman controls the deductibility of the MAR in the year of accrual; however, we must still decide the following issues: (1) Whether Balboa Energy Fund 1981, Ltd. (Balboa) for 1981 through 1983 and Drake Energy Fund 1983, Ltd. (Drake) for 1983 [4] were engaged in a trade or business within the meaning of section 162; if they were, we must further decide the deductibility of various expenses and credits *258 claimed; (2) Whether Balboa is entitled to any deduction in connection with abandonment of drilling units to reflect pro rata shares of capitalized lease bonuses, equipment costs, and accrued but nondeductible MAR incurred; (3) Whether any portion of the underpayment of tax by petitioner V.E. Kuster Co., Inc. [5] is attributable to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a); *259 (4) Whether there was a substantial understatement of tax within the meaning of section 6661(a) with respect to the taxable years of petitioner V.E. Kuster Co., Inc.; and (5) Whether petitioner V.E. Kuster Co., Inc. is liable for additional interest under section 6621(d). [6]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. The residence of each of the individual petitioners herein, and the principal place of business of each of the corporate and TMP petitioners at the time of the filing of their respective petitions, was in California. I. Balboa Program
A. Introduction
In 1981, Roy Osterhout (Osterhout) and one of his employees, Roy Molina (Molina), formulated a plan to promote oil and gas tax programs for the purported purpose of drilling for these minerals. Neither Osterhout, a graduate of the University of California at Los Angeles with a bachelors of science degree *260 in accounting, nor Molina, a graduate of the University of Southern California with a bachelor of science degree in accounting and a masters degree in business taxation, had prior experience in the oil and gas industry. To further their goal, Molina introduced Osterhout to attorneys at the law firm of Meserve, Mumper & Hughes (Meserve). Meserve had previously structured other oil and gas tax programs and had worked with various drillers and operators. On June 11, 1981, Osterhout met with John Deacon (Deacon) and Robert Weber (Weber), attorneys at Meserve, to discuss both an oil and gas drilling program and an oil rig drilling program, and the advantageous tax benefits of engaging in these activities. Moreover, they also discussed the funds that would be needed to promote and organize the venture. On September 15, 1981, Osterhout again met with the Meserve attorneys to discuss the overriding royalty structure of the proposed oil and gas tax program. Subsequent to this meeting, Osterhout decided to proceed with the oil and gas tax program. On September 30, 1981, Osterhout and Molina formed R & R Energy Corp. (R & R), a California corporation in which they were each 50-percent *261 shareholders. R & R was formed for the sole purpose of becoming the general partner in the oil and gas programs which Osterhout would promote. Subsequently, on June 9, 1983, R & R changed its name to Regional Resources, Inc. (Regional), and Osterhout became its sole shareholder. At all times relevant to the years before us, Osterhout was the president of R & R and its successor corporation. On the recommendation of Deacon, Osterhout considered acquiring oil and gas leases for the proposed tax programs from Allen Energy Corporation (Allen), and employing Allen as its driller operator. [7] *262 On November 4, 1981, Osterhout went to Kansas to meet with representatives of Allen and examine the Kirkpatrick prospect, which had already been drilled by Allen and was presently in operation. Additionally, Osterhout also met with Dick Tunnicliff (Tunnicliff), an employee of Allen, and reviewed the production records for the Kirkpatrick prospect; the production records indicated that the operating wells on the prospect were producing twelve barrels of oil a day at $ 34 a barrel. After the meetings, Osterhout decided to proceed with the Allen leases. [8]
On November 6, 1981, Osterhout organized Balboa as a limited partnership, with R & R as its general partner. According to its Certificate of Limited Partnership, Balboa's stated purpose was to acquire and develop oil and gas properties in the State of Kansas. As Balboa's general manager, Osterhout initially received 12-percent of the limited partners' initial capital contributions, and thereafter he received $ 1,500 per month. R & R distributed a confidential private placement memorandum (the Balboa memorandum) to prospective investors in the oil and gas tax program. B. Private placement memorandum.
The Balboa memorandum was prepared by Meserve and dated November 6, 1981. [9] The prospective investors consisted primarily of clients from Osterhout's accounting practice. The Balboa memorandum stated that 200 units in Balboa would *263 be offered and sold at $ 10,000 per unit in a private offering, and that the units had not been registered with the Securities and Exchange Commission or any State regulatory agency. The memorandum also stated that due to the high degree of risk involved with the investment, the units were only being offered to a limited number of sophisticated investors who had sufficient knowledge or professional advice to evaluate the partnership as an investment. Investors were required to satisfy R & R that they either had a net worth of $ 200,000 or a net worth of at least $ 50,000 and had during the last tax year, or anticipated that during the current tax year, they would have income which was taxable at a combined Federal and State income tax rate of at least 50 percent. *264 The Balboa memorandum greatly emphasized the tax benefits of subscribing to the Balboa partnership. The program was devised so that: (1) Balboa would acquire interests in oil and gas leases from Allen, the sublessor; (2) Balboa would incur MAR, payable to Allen, which would be assumed proportionately by the investors; (3) Balboa would accrue the MAR deductions; and (4) deductions for the MAR plus other credits and expenses would be passed through the Balboa partnership to the limited partners. Thus, due to the MAR accrual, the limited partners of Balboa would receive a tax deduction for the 1981 tax year equal to four times the cash invested and a tax deduction for the 1982 tax year equal to two times the cash invested. To partake in the Balboa program, the investors were required to purchase a minimum of 6 units, as well as execute an assumption of liabilities, described below. The subscription agreement also exculpated the general partner from liability for representations with respect to the partnership or its activities. Attached to the Balboa memorandum was a geological engineering report, prepared by William F. Ashburn (Ashburn), a geologist employed by Allen, [10] on the *265 Kirkpatrick and Blakemore prospects located in Chautauqua County, Kansas. [11] The geological engineering report, dated October 27, 1981, and supplemented November 17, 1981, stated that based on the production of seven existing wells, the typical well on the prospect could be expected to recover 16,000 barrels of oil over a 10-year period. [12]
*266 Also attached to the Balboa memorandum were the financial projections of the drilling program. The following assumptions with respect to the price of oil were used in the projections: Price. The price is assumed to be $ 35.00 per barrel of oil. These amounts are based on the Geology Report for what the estimated prices will be when the wells are expected to go into production. The price is assumed to increase at approximately 10% per year over the entire 15-year term of the projections. Any substantial variance in the rate of price increase would substantially alter the results of the projections.
The report neither provided documentation as to how these assumptions were determined nor did Osterhout seek an independent evaluation of the report. Rather, Osterhout and the investors accepted the pricing assumptions without question, documentation, or verification. Based on the price assumptions and the geological engineering report, the financial projections estimated a net tax benefit of $ 2,000,000 in 1981 and $ 1,231,000 in 1982 from the Balboa program. The report also projected that over a 15-year period Balboa would have cumulative taxable income after depletion *267 and windfall profit taxes in the amount of $ 8,868,000, cumulative cash distributions to the partners of $ 14,359,000, and an aggregate net tax liability of $ 4,305,000. C. Sublease and other agreements.
The oil and gas sublease, dated December 14, 1981 (occasionally referred to as the Allen sublease), was executed on behalf of Allen, as sublessor, and Balboa, as sublessee. Pursuant to the sublease, Balboa acquired from Allen a 100-percent working interest [13] in the Chautauqua prospects. Part of the consideration for the sublease was lease bonus payments to Allen totaling $ 177,000. [14] Under the terms of the Allen sublease, Balboa was obligated to pay a MAR of $ 67,231 per drilling unit in the first year. Because 52 drilling units were subleased, Balboa immediately incurred a MAR liability of $ 3,496,012 upon the signing of the sublease, without regard to the success or failure of any drilling program. Subsequently, on each of the anniversaries of the Allen sublease, Balboa would become liable for an additional MAR of $ 57,462 per drilling unit, subject to a cost-of-living deflator which reduced the minimum royalty inversely to inflation. Under the terms of the Allen *268 sublease, Allen was entitled to 50 percent of the oil and gas revenue from which it was responsible for the dispersement of the overriding royalty interests. The overriding royalty interests were reserved as follows -- 25 percent to the landowners, 5 percent to Osterhout and Molina, 5 percent to Meserve, and 15 percent to Allen. The Sublease also provided for the deferral of the payment of the MAR for a period of twelve years, as follows: 4. Deferral of Payment. In lieu of the payments required by Paragraph 2 hereof, the Sublessee, in its sole discretion, may elect *269 to defer payment of any Minimum Annual Royalty due. As a condition to any such deferral, the Sublessee shall deliver to Sublessor Assumptions of Liability * * * hereto (the "Assumptions"). Under such Assumptions, each of the limited partners of Sublessee shall assume primary personal liability, to a maximum of three hundred percent (300%) of their agreed upon initial cash capital contributions and one hundred percent (100%) of their initial note capital contributions to Sublessee, for the payment of each limited partner's pro rata share, based on the limited partner's interest in the capital of the Sublessee, of such deferred amounts. Such Assumption shall also contain a direction and authorization by the limited partner to Sublessee to pay directly to Sublessor out of funds otherwise payable to the limited partner an amount equal to fifty percent (50%) of the limited partner's pro rata share, based on the limited partner's interest in the capital of the Sublessee, of the Sublessee's "Production Revenues" for the period since the last distribution * * * plus, in Sublessee's General Partner's discretion, up to twenty-five percent (25%) of the difference between the amount *270 otherwise payable to the limited partner and fifty percent (50%) of the limited partner's pro rata share of the Sublessee's Production Revenues * * * The term "Production Revenues" shall mean the gross revenues of the Sublessee from the sale of oil and gas produced from the Prospects reduced by any and all windfall profits tax. Any amount so paid shall reduce the maximum amount for which such limited partner shall be liable under the Assumption. * * * All deferred amounts remaining unpaid as of the 1993 Anniversary Date of the Sublease shall be due and payable without interest at such time. The election to defer granted in this Paragraph shall be deemed to have been made in the event that the Sublessee shall fail to pay a Minimum Annual Royalty when due, provided that, on or prior to that date, the Assumptions referred to above are or have been delivered to the Sublessor. Sublessor further agrees to exonerate Sublessee's General Partner for any liability on all amounts assumed by the Limited Partners of the Sublease.
Thus, in order to defer the payment of the interest-free MAR, the limited partners were required to execute assumptions of liabilities. The Sublease *271 also contained an abandonment provision and an option to purchase, which provided as follows: 5. Abandonment. Sublessee may at anytime surrender or abandon any or all of the Drilling Units. Upon such abandonment of a Drilling Unit, no further obligations under this Sublease shall arise with respect to any abandoned Drilling Unit except those obligations previously incurred. Abandonment shall be accomplished by executing a Notice of Surrender of Sublease Drilling Unit, approved as form and content by counsel for the Sublessor and suitable for recording. 6. Option to Purchase. So long as the Sublease is in effect as to any specified producing Drilling Unit, Sublessee shall have the right and option to purchase all of Sublessor's right, title, and interest in and to the portion of the Base Lease or Leases pertaining to each such producing Drilling Unit. * * * As consideration for such exercise, Sublessor shall retain a percentage overriding royalty interest pertaining to the properties which are the subject of the Drilling Unit or Units so assigned equal to the difference between fifty-five (55) and the sum of the known overriding royalties existing as of the date *272 of this Sublease * * *. Sublessee will then be responsible for all overriding royalties which burden the portion of the Base Lease or Leases comprising such Drilling Unit or Units. * * *
The purpose of these clauses, as set forth above, was to enable Balboa to surrender a particular drilling unit if it was determined that the income from the well was insufficient to pay the future MAR which would accrue, and thus, stop the accrual of any future MAR on that particular unit. (Balboa would remain liable for any MAR which had already accrued.) But, if the wells were profitable, Balboa could elect to exercise the option to purchase. As consideration for the exercise of the option to purchase, Allen would be entitled an additional overriding royalty, as set forth supra. Balboa also entered into an agreement with Allen entitled "Turnkey Drilling and Completion Contract". Pursuant to the terms of this agreement, Allen was obligated to drill 42 wells on the prospects within 1 year of the agreement. The cost of drilling each well was fixed at $ 12,000 for a dry hole or $ 45,000 for a producing well (consisting of dry hole costs of $ 12,000, pipe setting and cement costs of $ *273 6,500, and intangible drilling costs of $ 15,750). During trial, Osterhout testified that the turnkey agreement was entered into to prevent possible cost overruns. On December 30, 1981, Balboa paid $ 150,000 to Allen for the drilling of the first four wells. [15]
Finally, Balboa entered into an operating agreement with Allen on December 18, 1981, whereby Allen agreed to serve as the operator, responsible for the mechanical operation of the producing oil and gas wells. For this service, Allen was paid $ 300 per well per month. On November 29, 1981, Don F. Kuster (Kuster), on behalf of V.E. Kuster Co., Inc. and as its president, executed a subscription agreement wherein it subscribed to 120 units in Balboa, thereby making a capital contribution to Balboa of $ 1,200,000. Prior to investing, Kuster consulted with Osterhout and employees of Coopers & Lybrand. [16] In December 1981, R & R subscribed to two units in Balboa, thereby acquiring a 1-percent interest in Balboa. *274 D. Alternate Balboa program.
Allen's funds were deposited in the Penn Square Bank, and on or about July 7, 1982, Osterhout became aware that the Penn Square Bank had failed. Balboa had recently sent Allen a check, dated June 1, 1982, in the amount of $ 479,500. On July 13, 1982, during meetings with Allen representatives, Osterhout learned that Allen had lost approximately $ 400,000 in deposits at the Penn Square Bank and became apprehensive about continuing the Balboa program with Allen as its sublessor and operator. In determining whether to continue Balboa's relationship with Allen or terminate Balboa's relationship with Allen and find substitute leases, Osterhout retained David Lawson (Lawson), an independent petroleum engineer, on September 13, 1982, to evaluate the results of *275 the drilling already commenced on the Allen leases and to evaluate alternate leases proposed by Jim MacLean (MacLean) and held by Coastal Petroleum (Coastal). [17]
On November 17, 1982, Balboa executed a "Notice of Surrender of Sublease Drilling Units and Abandonment of Interest on Oil and Gas Sublease" thereby abandoning its interest in the Allen sublease. Although, in Osterhout's opinion, Allen owed Balboa more than $ 600,000, and Balboa (and the investors) owed Allen an unpaid accrued MAR, neither Balboa nor Allen took any action against the other. Balboa's investors were advised by Osterhout of his belief that the Allen assumption agreements were not enforceable. In the interim, Osterhout met with Donald Coleman (Coleman), the chief executive officer of Coastal, Gary L. Neely (Neely) and Richard N. Polk (Polk) (employees of Coastal), MacLean, and Richard Enroth (Enroth) on October 13, 1982, and was apprised of certain Ohio prospects and Kansas prospects *276 referred to, respectively, as the Averill and Manners leases. Based on Lawson's report, Osterhout decided to proceed with the Averill leases because, in Lawson's opinion, they were similar to the abandoned Allen leases. Thus, Balboa entered into a Sublease Agreement, dated October 19, 1982, with the Mac En Corporation [18] (Mac En) as sublessor. Pursuant to the Sublease, Mac En would drill 50 sites on the Averill lease; each site was subject to a MAR of $ 29,500. Accordingly, in 1982, Balboa incurred an additional aggregate MAR of $ 1,475,000. Under the terms of the Sublease, Mac En was entitled to 38 percent of the oil and gas revenues from which it was responsible for the dispersement of the overriding royalty interests. The overriding royalty interests were divided as follows -- 12.5 percent to the landowners, 3 percent to the intervening title holders, 9.5 percent to Coastal, 10 percent to R & R, and 3 percent to Mac En. Additionally, the sublease contained an option *277 to purchase which could be exercised by Balboa's giving Mac En an additional 5-percent overriding royalty as consideration. The remainder of the sublease was substantially similar in form and substance to the Allen sublease. Balboa and Coastal entered into a Turkey Drilling Contract, dated October 20, 1982, whereby Coastal agreed to undertake the new drilling operations. The agreement provided for a fixed drilling cost of $ 38,500 per well for the drilling of 23 oil wells and the completion of 19 other oil wells. [19] Additionally, Balboa entered into an operating agreement with Coastal, whereby Coastal agreed to operate the wells located on the prospect covered by the Mac En Sublease. For this service, Coastal was to be paid $ 100 per well per month. On December 14, 1982, R & R sent Balboa's limited partners *278 a letter advising them that the assumption of liabilities which they had executed for the MAR due Allen for the 1982 year would be replaced by assumptions in similar amounts payable to Mac En, the new sublessor; no further information was provided to them nor did the investors request additional information. By August 5, 1983, 24 of the wells had been completed on the Averill lease and were operational. However, on December 10, 1983, Balboa recorded a document entitled "Notice of Surrender of Sublease Drilling Units", abandoning the 25 non-operational wells. Balboa prepared and filed its partnership returns for calendar years 1981, 1982, and 1983 on the accrual basis. For 1981, the partnership return showed zero income, total deductions of $ 4,001,003, and an overall loss of $ 4,001,003. The following is a list of the deductions claimed by the partnership: Deductions claimed for 1981 Organization Costs
$ 968      Minimum annual royalties
3,496,012
Intangible drilling costs
504,000
Miscellaneous expense
23
Total Deductions
$ 4,001,003
Ordinary loss
$ 4,001,003
Balboa's partnership return for 1982 reported $ 1,654 of gross receipts from the production of oil *279 and gas, total deductions of $ 2,335,498, and an overall loss of $ 2,340,082. The deductions claimed for 1982 by the partnership on an accrual basis were as follows: Depreciation
$ 95,288   Organization costs
10,480
Minimum annual royalties
1,475,000
Intangible Drilling Costs
541,035
Miscellaneous expense
842
Management fees
18,000
Professional fees
13,298
Travel
4,555
Lease abandonment
177,000
Total deductions
$ 2,335,498
Ordinary loss
$ 2,340,082
Balboa's partnership return for 1983 reported gross receipts of $ 80,276 from oil and gas production. The return shows total deductions of $ 145,351 consisting of the following: Taxes
$ 2,081  Depreciation
71,693
Miscellaneous expense
583
Management fees
18,720
Professional fees
15,483
Travel
267
Operating costs
26,712
Organization costs
9,812
Total deductions
$ 145,351
Ordinary loss
$ 62,752 While the terms of the sublease provide for accrual of the MAR for each year of a well's operation, no MAR was accrued for 1983. No limited partners were asked to assume any 1983 MAR and no MAR was paid by Balboa in 1983. In the notices of deficiency, respondent determined that the deductions claimed *280 by the Balboa limited partners for 1981 and 1982 were not allowable because it has not been established that Balboa was engaged in a trade or business or that Balboa engaged in its oil and gas drilling activity with the requisite profit objective. In addition, the notices of deficiency set forth a series of alternative grounds for disallowance of the losses and deductions claimed if it were determined that Balboa had been engaged in a trade or business. For 1983, respondent determined in an FPAA that ordinary loss for Balboa was zero upon similar grounds. Additionally, respondent determined that petitioners were liable for the additions to tax and additional interest as set forth supra. II. Drake Program[20]
A. Introduction.
On March 30, 1983, Osterhout began inquiring into the Brookside leases, previously proposed by Coastal in 1982, *281 located in Medina County, Ohio. Osterhout, on May 4, 1983, discussed the prospect of a new oil and gas program with Deacon and Weber. In deciding whether to proceed with the Brookside leases, Osterhout examined geology reports prepared by David Harmon (Harmon) and Herbert White (White); such reports were commissioned by Coastal. Harmon's report was based on the following assumptions: [21]
Based upon the logs supplied by you covering three wells on the Brookside Development Company tract in Montville Township, Medina County, Ohio, I have calculated volumetric recoverable reserves from these wells. * * * These calculations are based upon log data and should be reviewed when production history is sufficient to plat accurate decline curves. Using a product price similar to those in your previous report, i.e., $ 35. per barrel for oil and $ 5. per MCF for gas, these wells average to 100% $ 1,090,604 over the life of the well.
Osterhout *282 requested Coopers & Lybrand review and opine to the geology reports and engineering data contained within. In a letter dated June 10, 1983, Patrick Kiernan (Kiernan), of Coopers & Lybrand's Oil and Gas Department, stated the following: We have also reviewed a volumetric reserve analysis done by David Harmon, an independent geologist, on the three wells already drilled on the Brookside tract. * * * The results of volumetric analysis are characteristically high. Consequently, there is a high degree of uncertainty associated with the reserve quantities * * * partly also because of a lack of information on analogous wells in the area. * * * We did not have sufficient information to estimate net future cash flows from these wells. Harmon does estimate an average gross recoverable reserve value of $ 1,090,604 per well in the area. However, this undiscounted amount assumes a constant price of $ 35/bbl for oil and $ 5/MCF for gas, which we do not consider reasonable under current economic conditions. Furthermore, this amount does not take into account the capital cost of drilling these wells. * * * We favor, under current economic conditions, a scenario which would assume an initial *283 oil price of $ 28/bbl, held constant to 1-1-85 and then escalated at 6% per year to $ 60/bbl. We also suggest that gas be escalated at 6% per year to a maximum of $ 7.50/MCF. The estimated reserve quantities, as shown in the preceding table, could be misleading since they were strictly derived from log analysis. In fact, these reserves may be questionable because of the nature of the Clinton-Medina formation. (Emphasis in original.)
Kiernan further stated, in a report dated July 6, 1983, that his evaluation of the oil reserves, based on the well log data and by analogy with statistical review of 65 Clinton Sand wells, indicated oil reserves which were substantially lower than those suggested in the Harmon report (although his report did indicate somewhat greater gas reserves). [22] Moreover, Kiernan suggested that Osterhout should assume an uncertainty factor of 20 percent, which would further increase the discrepancy between his report and the Harmon report. Nevertheless, Osterhout ignored Kiernan's report, and proceeded based upon Harmon's report which utilized volumetric analysis and contained higher estimated oil reserves and more favorable price assumptions. *284 On June 21, 1983, Osterhout organized Drake to acquire and develop oil and gas properties in the State of Ohio as a limited partnership with Regional (formerly R & R) as its general partner. During 1983, Osterhout was the general manager of Drake and for his services received 12 percent of the limited partners' initial capital contributions and thereafter received $ 1,500 per month. B. Private placement memorandum.
A Confidential Private Placement Memorandum (the Drake memorandum), prepared by Martin, Davis, & Deacon, [23] was released on July 15, 1983, to prospective investors in the Drake program. Pursuant to the memorandum, Regional offered 200 units of Drake for sale at $ 6,400 per unit; the minimum purchase was 3 units. In addition, each limited partner was required, as part of the initial capital contribution, to execute an Assumption of Liabilities under which each partner assumed primary liability for his pro rata share of the MAR. Thus, due to the MAR accrual, the limited partners of Drake would receive a tax deduction for the 1983 tax year equal to 3 times the cash invested and a tax deduction for the 1984 tax year equal to 1 to 1-2/3 the cash invested. Like *285 the Balboa memorandum, the Drake memorandum contained a tax opinion letter, prepared by Martin, Davis, & Deacon, emphasizing the tax benefits of subscribing to the Drake program. In fact, the Drake memorandum was almost identical to the Balboa memorandum. Attached to the memorandum was a geology report prepared by Neely and a reserve report prepared by White. Neely's report provided a general description as to the geology of the Averill lease. White's reserve report stated that over a 12-year period, the average Drake well could be expected to produce approximately 24,496 barrels of oil, assuming an annual decline rate of 10 percent. Predicated on these reports, the memorandum contained financial projections based on the following price and production assumptions: Price. The price is assumed to be $ 28.00 per barrel of oil and $ 4.35 per MCF of gas when the initial wells go into production. *286 The projections assume that the initial wells will go into production in May, 1984. The price of oil and gas is assumed to increase at approximately 8% per year over the entire term of the projections. Any material variance in the rate of price increase, or in the price at which the oil and gas is actually sold, could substantially alter the results of the projections. Production Levels. Production levels can be affected by many factors, * * *. The initial drilling program as described in the Memorandum contemplates the drilling of eight (8) wells and completion of seven (7) wells in the Clinton formation. In addition, it has been assumed commencing in 1986 eleven (11) oil wells in the Berea formation are drilled and completed. It is projected that four (4) additional wells are to be drilled and four (4) completed out of production revenues in the Clinton formation. It has been assumed that all eleven (11) completed Clinton wells and all eleven (11) completed Berea wells will be in production by January, 1988.
Based on these assumptions, the financial projections estimated that the program would yield a net tax benefit over the first 3 years in the respective *287 amounts of $ 975,000, $ 304,000, and $ 84,000. Furthermore, the projections anticipated, over a 15-year period, cash distributions in the aggregate amount of $ 5,710,000; an aggregate tax liability of $ 1,357,000; and an after-tax economic profit of $ 3,073,000. C. Sublease and other agreements.
As part of the documentation of the program, an oil and gas Sublease (referred to as the Mac En sublease) was entered into on September 20, 1983, between Mac En, as sublessor, and Drake, as sublessee. Pursuant to the sublease, Drake acquired a 100-percent working interest in the Brookside leases. Similar to the Balboa program, Drake was obligated to pay Mac En a MAR of $ 75,000 per drilling unit per year for the first four years of the sublease. A total of 12 drilling units were subleased; accordingly, Drake immediately incurred a liability of $ 900,000. Subsequently, on each of the next sixteen anniversaries of the Mac En sublease, Drake would become liable for an additional MAR of $ 64,000 per drilling unit, subject to a cost-of-living deflator which reduced the MAR inversely to inflation. Additionally, under the terms of the Sublease, Mac En was entitled to 40 percent of the *288 oil and gas revenues. However, Mac En also remained responsible for the dispersement of the overriding royalties in the following amounts: 12.5% to the landowners; 14.5% to Coastal; 10% to Osterhout; and, the remaining 3% was to be retained by Mac En. Moreover, the sublease contained provisions substantially similar to the Allen sublease, discussed supra at 11-14, which pertained to the payment and deferral of the MAR, abandonment of the wells, and the option to purchase. However, differing from the option to purchase contained in the Allen sublease, Drake could exercise its option to purchase by granting Mac En an additional 3-percent overriding royalty (rather than an additional 5-percent overriding royalty). As in the Balboa program, the limited partners were required to execute assumptions of liabilities for their proportionate share of the accrued MAR. Drake and Coastal executed a "Turnkey Drilling and Completion Contract" dated October 5, 1983. The contract provided that Drake pay Coastal a minimum fee of $ 130,00 per well for the drilling of eight wells and the completion of eight wells on the leased property. Once again, Osterhout stated that he entered into the *289 Turnkey Agreement on behalf of Drake to prevent cost overruns. Finally, Drake and Coastal entered into an Operating Agreement, whereby Coastal was responsible for the operation and maintenance of the wells. Pursuant to the agreement, Coastal would perform all normal operating procedures for $ 350 per month per well. On August 30, 1983, Kuster, on behalf of V.E. Kuster Co., Inc., and as its president, executed a subscription agreement wherein it subscribed to 130 units in the Drake program. In December 1983, Regional subscribed to two units in Drake; thus, during the existence of the Drake program, Regional owned approximately a 1-percent interest in Drake. A total of 198 units were subscribed to. On September 19, 1984, Drake sent Mac En a Notice of Surrender on four of the wells. On March 19, 1985, Osterhout was informed that Coastal had commenced voluntary bankruptcy proceedings under the provisions of Chapter 11 of the Bankruptcy Code. Although Osterhout retained the law firm of O'Melveny & Meyers to advise Drake as to its rights with respect to Coastal's bankruptcy proceeding, ultimately Drake lost its interest in the leases through the bankruptcy proceeding. [24]
*290 Coopers & Lybrand prepared and filed Drake's partnership returns for the calendar years 1983, 1984, and 1985 on the accrual basis. For 1983, the partnership return reported $ 7,908 of gross receipts from oil and gas production, total deductions of $ 1,961,588, and an overall loss of $ 1,946,842. The following is a list of the deductions claimed by the partnership: Deductions claimed for 1983 Minimum annual royalties
$ 900,000  Intangible drilling costs
1,040,000
Organization costs
1,535
Management fees
4,500
Professional fees
1,003
Miscellaneous
300
Operating costs
14,250
Total deductions
$ 1,961,588
Total loss
$ 1,946,842
Drake's partnership return for 1984 reported $ 452,944 of gross receipts from the production of oil and gas, total deductions of $ 216,354, and income of $ 242,225. The deductions claimed for 1984 by the partnership on an accrual basis were as follows: Organization costs
$ 6,141  Management fees
18,000
Professional fees
15,101
Travel
2,039
Miscellaneous
274
Severance tax
1,501
Operating expense
173,298
Total deductions
$ 216,354
Total income
$ 242,225
Drakes's partnership return for 1985 shows gross receipts of $ 250,561 *291 from oil and gas production. The return shows total deductions of $ 215,110 consisting of the following: Taxes
$ 805    Miscellaneous expense
161
Management fees
18,816
Professional fees
7,808
Travel
734
Operating costs
180,645
Organization costs
6,141
Total deductions
$ 215,110
Total income
$ 35,451 As with Balboa for 1983, notwithstanding the annual accrued liability for MAR with payment deferral based on the pro-rata assumption by the limited partners, Drake neither accrued nor paid any MAR in 1984 or 1985. In the notices of deficiency, respondent determined that the deductions claimed by petitioners were not allowable because Drake had not established that it was engaged in a trade or business or that Drake engaged in the activity of drilling for oil and gas with the objective of making a profit. The notices of deficiency also set forth a series of alternative grounds for disallowing the losses if it were determined found that Drake was engaged in a trade or business. Additionally, respondent determined that petitioners are liable for the additions to tax and additional interest as set forth above. OPINION I. Introduction
In our findings of *292 fact, we have set forth a list of the deductions claimed on the partnership returns of Balboa and Drake for 1981, 1982, and 1983, which are before the Court. The losses claimed by the partnerships were passed through the partnerships to petitioners and the other limited partners who claimed such losses as deductions on their respective individual returns. We must decide whether such deductions are allowable. Respondent contends that neither Balboa nor Drake were engaged in trade or business in that they were not organized or operated with the objective of making a profit and that the partnerships lacked economic substance. Respondent argues that the sublessors, Allen and Mac En, were merely "strawmen" and that the subleases were entered into merely to create a facade whereby Balboa and Drake were "obligated" to accrue "minimum annual royalties", so that the limited partners through their "assumption of liabilities" would have a sufficient basis in the partnership for claiming the tax deductions promised in the promotional literature. Secs. 722, 752(a). Respondent maintains that the possibility that the MAR would actually be paid was so speculative as to be illusory and that there *293 was never any intention on the part of the limited partners to pay the amounts evidenced by their assumptions of liabilities. According to respondent, the foundation of the promotion is the MAR, and its existence demonstrates that the partnerships did not have the objective to make a profit. Consequently, respondent contends that the disputed deductions are not allowable. Petitioners concede that the deductions claimed by Balboa and Drake for advanced minimum annual royalties do not fall within the purview of the "minimum royalty provision" provided in sec. 1.612-3(b)(3), Income Tax Regs. See Heitzman v. Commissioner, 859 F.2d 783 (9th Cir. 1988), affg. T.C. Memo. 1987-109. However, petitioners contend that the advanced minimum annual royalties are deductible in the year in which the oil and gas leases, in respect of which the advanced minimum annual royalties were incurred, are sold or abandoned. Petitioners also maintain that Balboa and Drake were carrying on a trade or business, that petitioners' assumption of their proportionate share of Balboa's and Drake's liabilities gave them a basis in their partnership interests *294 sufficient to support the deductions claimed, and that petitioners are entitled to the benefit of the claimed deductions. II. Whether Balboa and Drake were engaged in a trade or business
A. Profit objective.
It is well established that a transaction entered into solely for favorable tax consequences, having no commercial, legal, or profit objective will not be given effect for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Patin v. Commissioner, 88 T.C. 1086, 1116 (1987), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989). Thus, the substance of a transaction rather than its form will govern the tax treatment it receives. Patin v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557, 569 (1985). Therefore, in transactions where tax motivation is evident, we must determine whether a sufficient business purpose existed so as to warrant the tax benefits claimed. Rose v. Commissioner, 88 T.C. 386, 412-413 (1987), affd. 868 F.2d 851 (6th Cir. 1989). *295 Petitioners have the burden of showing that the partnerships' activities were undertaken with "the actual and honest" objective of making a profit. Nickeson v. Commissioner, 962 F.2d 973, 976 (10th Cir. 1992), affg. Brock v. Commissioner, T.C. Memo. 1989-641; Karr v. Commissioner, 924 F.2d 1018, 1023 (11th Cir. 1991), affg. Smith v. Commissioner, 91 T.C. 733 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). "Profit" in this context means economic profit, independent of tax savings. Beck v. Commissioner, supra at 570; Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, supra at 644-645. Whether the activities of a partnership were engaged in with an actual and honest profit objective is analyzed at the partnership level. Antonides v. Commissioner, 91 T.C. 686, 694-695 (1988) (Court reviewed), *296 affd. 893 F.2d 656 (4th Cir. 1990); Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The factors set forth in the Treasury regulations under section 183 are generally utilized in determining whether the requisite profit objective is present under section 162. Independent Electric Supply, Inc. v. Commissioner, 781 F.2d 724, 726-727 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Brannen v. Commissioner, supra at 504. Those factors are not exclusive, and all of the unique and relevant factors and circumstances of the particular investments at issue are regarded. Nickeson v. Commissioner, supra at 977. In light of the evidence presented, we conclude that the objective of the Balboa and Drake programs was to help investors avoid taxes and to enrich the coffers of the promoters, i.e., Osterhout, Meserve, and the sublessors. The arrangement lacked economic substance, and there was never any realistic opportunity *297 for either Balboa or Drake to profit due to the overriding royalty structure. Based on the promotional material presented into evidence, it appears that the objective of the Balboa and Drake programs was the promotion of tax benefits. Those materials emphasized the tax benefits that were available to the limited partners of the Balboa and Drake programs. Rose v. Commissioner, supra at 412. Moreover, since Balboa and Drake adopted the accrual method of accounting, the promotional materials emphasized that the partnerships would be able to deduct the minimum annual royalty as the liability accrued, rather then waiting for the payment of such liability. Accordingly, the limited partners, who were in the 50-percent tax bracket, would benefit regardless of whether oil and gas was actually produced or for that matter, the partnerships were actually profitable. Thus, the investor could "win" by receiving the tax deductions even if no oil or gas was produced. Barnard v. Commissioner, 731 F.2d 230, 231 (4th Cir. 1984), affg. Fox v. Commissioner, 80 T.C. 972 (1983); Ferrell v. Commissioner, 90 T.C. 1154, 1183 (1988). *298 This Court has previously held that where the promised tax benefits are suspiciously excessive and the transaction is carried out with a complete indifference to profit, it is clear the parties intended to structure the transaction for the tax benefits. Flowers v. Commissioner, 80 T.C. 914, 941 (1983). The partnerships' complete indifference to profit is further demonstrated by the overriding royalties and fees which were provided to the promoters. After paying the overriding royalties, which were to be paid out of gross revenues, Balboa and Drake would retain a minimal amount of the profit, if any, for distribution to their investors. Furthermore, Osterhout initially received a substantial portion of the investor's money -- 12-percent of the initial capital invested and $ 1,500 per month from each of the partnerships as compensation for his management services. Moreover, the MAR structure utilized in the Balboa and Drake programs was foreign to the oil and gas industry. Mr. John Teeple, [25] an expert witness for respondent, testified that although MAR is used in coal leases due to the definitive quantity of coal that can be mined, they are *299 not, however, used in oil and gas leases due to the speculative nature of an oil well. We think any oil and gas business conceived with the notion of making a profit would not obligate itself to these types of MAR payments. Finally, after the dismal result in the Balboa program, the drilling of the dry wells and the alleged loss of funds to Allen (with no attempt by the general partner to recover such amounts), Osterhout and the investors proceeded without hesitation in almost identical programs with Mac En with respect to the alternate Balboa and Drake programs. In particular, the participants of the Drake venture were (or should have been) aware of the failure of the Balboa venture. It appears to the Court that such conduct is not indicative of an investor interested in profits (other than *300 tax benefits). [26]
B. Assumption of liabilities executed by the limited partners.
Petitioners contend that their assumption of the partnerships' liabilities increased their basis in their respective partnership interests, and thus, provided them with a sufficient basis in the partnerships to support their claimed deductions. Petitioners assert that these notes were recourse and were assumed by them, in good faith, to secure the payment of the MAR which the partnerships purportedly accrued. We do not believe that the assumption of liabilities executed by the limited partners constituted recourse notes or any bona fide assumption of liabilities. Courts have given credence to recourse notes as a basis for supporting claimed losses or establishing section 465 "at risk" amounts, when such notes are bona *301 fide. Pritchett v. Commissioner, 827 F.2d 644 (9th Cir. 1987), revg. and remanding 85 T.C. 580 (1985); Abramson v. Commissioner, 86 T.C. 360 (1986). However, in determining whether notes are bona fide, courts have looked at whether the purported recourse notes were given to independent third parties. In the instant case, we believe the notes were merely given to Allen and Mac En as a facade to support the current deductibility of the amounts accrued as MAR; without the notes there would be no basis for the deductibility of the MAR and ergo no tax deductions for the limited partners. The possibility of payment of the notes was so remote as to be illusory. In fact, at trial, Osterhout testified that he neither knew the amounts that were owed nor how or when such amounts would be paid. [27] Osterhout's exchange with the Court emphasizes the illusory nature of the limited partners' assumption of liabilities. *302 Secondly, we believe the notes bore no relationship to the value of the leases or the anticipated oil and gas production. See C. Price and revenue assumptions; infra p. 38. Indeed, the Balboa private placement memorandum, which contained the assumption notes and financial projections, was dated November 6, 1981, the same date that Osterhout was still "examining" the Kirkpatrick prospect to see if this was the prospect in which Balboa would "invest". Thus, if Osterhout was still evaluating the prospect to see if it would be viable, it seems incredulous that as of November 6, 1981, the private placement memorandum could already contain such information. Accordingly, we conclude that the value assigned the leases bore little relation, if any, to the actual value of such leases. Thirdly, as stated in Ferrell v. Commissioner, 90 T.C. 1154, 1188 (1988), the form of the notes was foreign to the business world. The principal was not due and payable for 12 years, but yet the notes were interest free. Finally, when Allen had financial trouble, Balboa terminated its relationship with Allen ignoring the MAR that had already accrued. In fact, in *303 a letter to the Balboa investors, Osterhout stated that the notes evidencing their assumption of liabilities which they had executed with respect to the MAR payable to Allen would be replaced with notes to secure the MAR payable to Mac En. Moreover, although Osterhout testified that he believed Allen owed Balboa funds, he did not pursue any action to recover these amounts. Additionally, in the third year of each partnership, when the limited partners did not assume any MAR allegedly accrued, the partnership neither accrued nor paid any MAR, thus confirming that the MAR was merely a device to convey tax benefits. Certainly, these facts indicate that the assumptions were not viewed as legitimate obligations intended for payment by either Balboa or Allen. C. Price and reserve assumptions.
We think that the promotional valuations pertaining to the prospective oil and gas production of Balboa and Drake were inflated. Petitioners' experts, in making their projections as to the potential cash-flow from the leases, state that the valuations were reasonable based on the reserves projected in the geology reports contained in the private placement memorandums, the future oil and gas *304 prices published in February 1982 in the 1981 Annual Report to Congress, which is issued by the U.S. Department of Energy, Energy Information Administration, and the 1982 Survey of Oil Price Projections prepared by the Society of Petroleum Evaluations Engineers. [28]
We are not convinced of the accuracy of the geology reports relied upon by petitioners. In calculating the reserve estimates of the Balboa and Drake prospects, the geologists resolved every doubt in favor of the maximum possible reserves, assumed every well would be drilled, and utilized a method of valuation that was known to be characteristically high but not particularly accurate. Rather than utilizing independent data in determining the amount of the reserves, the geologists used assumptions provided by the sublessors, and, *305 in fact, the reports were commissioned by the sublessors. Moreover, Osterhout ignored the significantly lower oil reserve estimates and price assumptions contained in the independent report pertaining to the Drake prospect prepared by Coopers & Lybrand. With respect to Balboa, Osterhout never received an independent determination as to the viability of the program. We do not believe that the 1981 Annual Report to Congress can be relied upon as a basis for projecting income from the Balboa and Drake programs. The following table taken from the report lists the world oil price projections for 1979 to 2000 in real 1980 dollars and nominal dollars: [29]
In real 1980 dollars per barrel 1979
1980
1985
1990
1995
2000
Low price
23.50
34.00
26.00
35.00
49.00
50.00
Middle price
23.50
34.00
33.00
49.00
67.00
75.00
High price
23.50
34.00
38.00
60.00
88.00
100.00
In nominal dollars per barrel
1979
1980
1985
1990
1995
2000
Low price
21.50
34.00
38.00
72.00
129.00
164.00
Middle price
21.50
34.00
49.00
100.00
177.00
246.00
High price
21.50
34.00
56.00
123.00
232.00
328.00
At the time this report was prepared, world oil markets *306 had been destabilized by war in the Middle East, by the Iranian revolution and the resulting embargo, by production and export quotas of oil exporting countries, and by other actions of the Organization of Petroleum Exporting Countries (OPEC). Thus, this report represented the "worst-case" scenario. Krause v. Commissioner, 99 T.C. 132, (1992). Moreover, as the last paragraph of this report indicates, it was not to be relied upon in making business determinations. [30]
*307 The Balboa program's projections assumed an annual price escalation of 10 percent and the Drake program assumed an annual price escalation of 8 percent. Petitioners' expert report states: Recently the Society of Petroleum Evaluations Engineers conducted their ninth annual survey of oil price projections. * * * As shown, the 1982 survey of lending institutions (banks, insurance companies, operating oil companies, etc.) indicated the thinking at that time was, that is, prices were going up 10% (average) per year for the nine years.
Thus, petitioners' expert report concludes that the use of a 10- percent and 8-percent escalation clause by Balboa and Drake was reasonable. However, we believe that petitioners' expert's interpretation of the survey is erroneous. The following excerpt from the survey indicates that the average annual price escalation from 1982 to 1991 was 7.68 percent per year and, accordingly, the price of oil in 1991 would reach $ 58.87: Year
Price ($ /BBL)
1982
30.20
1983
31.31
1984
33.35
1985
36.03
1986
38.94
1987
42.10
1988
45.51
1989
49.21
1990
53.22
1991
58.87
Furthermore, in Ferrell v. Commissioner, 90 T.C. at 1195 n.27, *308 this Court took judicial notice of the following excerpt published in 7 Basic Petroleum Data Book, no. 3 (Sept. 1987), which cited the price of crude oil in specific states, as well as the United States as a whole: 1983
1984
1985
Colorado
$ 35.69
$ 31.56
$ 28.92
$ 28.09
$ 25.64
Louisiana
35.45
32.44
30.02
29.67
27.24
Texas
35.06
31.77
29.35
28.87
26.80
United States
31.77
28.52
26.19
25.88
24.08
Thus, based on the information available at the time, and the declining price of oil, it seems absurd that Osterhout would not question the price projections contained in the Balboa and Drake private placement memorandums which anticipated oil prices to ultimately reach $ 132.91 and $ 76.15 per barrel, respectively. Furthermore, as the leases were not entered into until late 1981, 1982, and 1983, the declining price of oil should have been all the more apparent to both Osterhout and the limited partners. D. Conclusion.
In conclusion, Balboa and Drake were formed solely to enrich the promoters and provide tax deductions for the limited partners. The activities of Balboa and Drake served no viable commercial or profit objective. Although *309 we recognize that oil and gas exploration is speculative and large profits can be realized from a bona fide oil and gas venture, that Congress enacted various tax measures to encourage oil and gas exploration, and that the promotional materials of Balboa and Drake contained representations regarding potential profits, the manner in which Balboa and Drake were structured and their activities carried out demonstrates that any profit objective was incidental to the tax benefit. The promotions were designed for the purpose of sheltering income. The activities of Balboa and Drake had no practical economic effect other than the creation of tax benefits as evidenced by the notes to Allen and Mac En which provided for the accrual of the MAR. A transaction entered into for tax benefits without any objective prospect of producing a profit apart from tax benefits will not be given effect for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Ferrell v. Commissioner, 90 T.C. at 1199; Beck v. Commissioner, 85 T.C. 557, 569 (1985). Accordingly, petitioners are not entitled to *310 the losses disallowed by respondent. III. Abandonment Loss
Alternatively, petitioners now contend that they are entitled to abandonment losses of Balboa under the provisions of section 165(a). Petitioners contend that while the MAR was not deductible under Heitzman, it nevertheless was properly accruable. Therefore, when the wells were abandoned, the partnerships had a basis in the wells which could be deducted. We do not believe there is any merit in this contention. In the foregoing discussion we determined that the notes given to Allen and Mac En did not constitute genuine indebtedness, but, rather, were executed for tax purposes so as to provide the limited partners with MAR deductions. The transaction, therefore, does not establish that Balboa had any basis in any well which would support the claimed abandonment losses. IV. Section 6653(a)
Section 6653(a) and section 6653(a)(1) impose an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest on the portion of the underpayment attributable *311 to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Don Kuster, on behalf of petitioner V.E. Kuster Co., Inc., demonstrated an indifference to the economic plausibility of the Balboa and Drake programs. Mr. Kuster was the president of V.E. Kuster Co., Inc., a company which manufactured underground oil well instruments. Petitioner accepted the packaged programs with nothing more than the assurances attached to the offering. Although petitioner was involved in the oil industry, petitioner lacked oil and gas drilling experience; nevertheless, petitioner made no serious efforts to inquire into the economic aspects of the oil drilling programs. Moreover, when the initial Balboa prospects were replaced with other properties, petitioner willingly accepted such replacement without questioning the viability of the replacement prospects and its liability for the assumption notes to Allen. In short, petitioner's actions show an absence of any diligent and good faith effort to investigate the soundness of the drilling *312 programs. The failure of petitioner to make a meaningful investigation beyond the promotional materials supplied by the promoters or to consult independent advisers was not reasonable or in keeping with the standard of the ordinarily prudent person. See Laverne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. by unpublished opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992). Although petitioner's president, Kuster, met with tax advisers at Coopers & Lybrand, such meeting was perfunctory and did not constitute a "meaningful investigation". Based on this record, we conclude that petitioner V.E. Kuster Co., Inc. is liable for the additions to tax under section 6653(a). See also Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531; Hodges v. Commissioner, T.C. Memo. 1992-370. V. Section 6661(a)
Respondent determined additions to tax under section 6661(a) against petitioner V.E. Kuster, *313 Co., Inc. for the taxable years ending June 30, 1980, and June 30, 1983. With respect to returns the due date for which is after December 31, 1982, section 6661(a) originally imposed an addition to tax equal to 10 percent of any underpayment attributable to a substantial understatement of income tax. [31] However, the rate of the addition to tax is 25 percent on additions assessed after October 21, 1986. Pallottini v. Commissioner, 90 T.C. 498 (1988). A substantial understatement is one which exceeds the greater of either 10 percent of the tax required to be shown on the return or $ 5,000 ($ 10,000 in the case of most corporations). Sec. 6661(b)(1). The amount of the understatement may be reduced by an amount for which there was substantial authority for the treatment adopted by the taxpayer on his return. Sec. 6661(b)(2)(B)(i). This reduction is not available in the case of a tax shelter unless, in addition, the taxpayer reasonably believed that the claimed tax treatment was "more likely than not" the proper tax treatment. Sec. 6661(b)(2)(C)(i)(II). For this purpose, section 6661(b)(2)(C)(ii) defines a tax shelter as any partnership or other *314 entity or investment plan or arrangement the principal purpose of which is the avoidance or evasion of Federal income tax. Based on the entire record, we have determined that the Balboa and Drake programs were partnerships whose objective was tax avoidance and therefore were not engaged in a trade or business with a profit objective. Claims based upon transactions whose principal purpose is the avoidance of income tax are not recognized. Horn v. Commissioner, 90 T.C. 908, 943 (1988). In view of the substantial tax benefits promised to the investors, and the complete absence of economic feasibility in the proposed drilling activities, we hold that the principal purpose of the programs at issue was tax avoidance and therefore the programs are tax shelters within the meaning of section 6661. Sec. 6661(b)(2)(C)(ii); sec. 1.6661-5(b)(1), *315 Income Tax Regs.
The return of petitioner V.E. Kuster Co., Inc. for its fiscal year ended June 30, 1983, has a due date after December 31, 1982, and the amount of understatement for that return meets the requirements of section 6661(b). From the testimony of Kuster, it is clear that he, on behalf of petitioner, did not make the kind of factual and legal analysis of the Balboa and Drake programs so as to enable him to formulate any reasonable belief one way or the other as to whether the tax treatment which petitioner gave its Balboa and Drake deductions was more likely than not the proper treatment. To the extent that Kuster maintains that he believed that such tax treatment was more likely than not the proper treatment, we conclude that such belief was not reasonable. Accordingly, we hold that the section 6661(a) addition to tax is applicable for that year. VI. 6621(c)
Section 6621(c) provides for an increased interest rate with respect to any "substantial underpayment" (greater than $ 1,000) in any taxable year "attributable to one or more tax motivated transactions". The increased rate of interest applies to interest accrued after December 31, 1984, even though the *316 transaction was entered into prior to the enactment of the statute. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The term "tax motivated transaction" includes any "sham or fraudulent transaction". Sec. 6621(c)(3)(A)(v). The statutory language encompasses transactions which lack profit objective and which are without economic substance. Cherin v. Commissioner, 89 T.C. 986, 1000 (1987). However, the section 6621(c) increased rate of interest does not apply to deductions disallowed on separate and independent grounds which do not fall within the specified categories of tax motivated transactions. McCrary v. Commissioner, 92 T.C. 827, 858-860 (1989). In the instant case, petitioners have conceded the non-deductibility of amounts claimed as advanced minimum royalty payments under section 1.612-3(b), Income Tax Regs., based on the Court's decision in Heitzman v. Commissioner, T.C. Memo. 1987-109, affd. 859 F.2d 783 (9th Cir. 1988). In *317 Heitzman, the Court determined that the MAR did not meet the technical requirements of sec. 1.612-3(b), Income Tax Regs. Accordingly, to the extent that petitioner's underpayment of tax is attributable to the disallowed advanced minimum royalty deductions, petitioner, is not liable for the increased rate of interest under section 6621(c). However, the disallowance of all other deductions of Balboa and Drake was sustained on the grounds of lack of profit objective. Petitioner, therefore, will be liable for the increased rate of interest under section 6621(c) for the underpayment in tax attributable to these adjustments, if the underpayment for each year exceeds $ 1,000. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Karen G. Kuster, docket Nos. 21489-85, 16092-87, and 21522-88; Don A. and Jane A. Kuster, docket Nos. 21727-85 and 38088-85; Meserve Drilling Partners, Regional Resources, Inc., fka R & R Energy, Inc., Tax Matters Partner, docket No. 19262-86; Columbia Energy Fund 1982, Regional Resources, Inc., fka R & R Energy, Inc., Tax Matters Partner, docket No. 19904-86; Roy and Mary L. Osterhout, docket Nos. 25184-86 and 43065-86; Mesmuhu Energy Partners, Ltd., Regional Resources, Inc., Tax Matters Partner, docket No. 12259-87; Drake Energy Fund 1983, Regional Resources, Inc., Tax Matters Partner, docket No. 13367-87; Balboa Energy Fund 1981, Regional Resources, Inc., Tax Matters Partner, docket No. 13686-87; and, V.E. Kuster Co., Inc., & Subsidiary, docket No. 19972-88.↩
2. Although Mr. Deacon was originally counsel of record in all dockets, he withdrew in all but dockets Nos. 19904-86, 13367-87, and 21522-88.↩
3. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
5. Respondent has conceded the additions to tax under sec. 6659.↩
1. For the indicated period the addition to tax is under sec. 6653(a).↩
4. The annual rate of interest payable shall be 120 percent of the underpayment rate provided under sec. 6621. In docket No. 16092-87, this adjustment was raised by respondent in the Answer; therefore respondent has the burden of proof. Rule 142(a).↩
2. Plus 50 percent of the interest due on the deficiency under sec. 6653(a)(2).↩
3. 25 percent of any underpayment attributable to a substantial understatement of income tax, as an alternative to the sec. 6659 determination.↩
4. The parties have stipulated that our opinion, if consistent as to Balboa and Drake, will determine the proper tax treatment of the other partnerships at issue. However, in the event that our opinion is not consistent as to Balboa and Drake, then further proceedings may be necessary.↩
5. All parties herein have agreed to be bound by the Court's opinion regarding the application of the additions to tax provided for under secs. 6653(a), 6661(a), and the increased rate of interest provided for in sec. 6621(c) based upon resolution of these issues in the case of petitioner V.E. Kuster Co., Inc., docket No. 19972-88.↩
6. The Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c), 100 Stat. 2744, redesignated sec. 6621(d) as sec. 6621(c); the act also altered the definition of "tax motivated transaction" to include any "sham or fraudulent transaction" effective for interest accruing after Dec. 31, 1984. Id.↩ at 100 Stat. 2750. We will hereinafter refer to this section as sec. 6621(c).
7. Allen Energy Corporation was a subsidiary company of J.D. Allen Industries, Inc., the sole shareholder of which was J.D. Allen. J.D. Allen, the Allen Energy Corporation, J.D. Allen Industries, Inc., and affiliated companies are collectively referred to herein as Allen.↩
8. At that time, Osterhout met with representatives of the accounting firm of Coopers & Lybrand, such as John Brainerd, to inquire as to their opinion of Allen. Although their opinion was favorable, Coopers & Lybrand never opined to the viability of the program.↩
9. Presumably, on November 6, 1981, Osterhout was still in Kansas evaluating the proposed leases for the oil and gas tax program. Thus, apparently the project was scheduled to be started long before that date, subject, perhaps, to Osterhout's discovering something requiring a halt.↩
10. In fact, the report was addressed to Allen employees Dick Tunnicliff and Jerry Andrews.↩
11. Chautauqua County is located in the southeastern portion of Kansas, on the Oklahoma state line.↩
12. Petitioners' expert report, prepared by David Thompson, a partner in the law firm of Atkinson, Andelson, Loya, Ruud, & Romo, contained the following table based on Ashburn's projections: ↩
Barrels of
Barrels of
Barrels of
Year
oil per day
oil per year
oil cumulative
1
9.00
3,060
3,060
2
7.20
2,448
5,508
3
5.76
1,958
7,466
4
4.61
1,567
9,033
5
4.15
1,411
10,444
6
3.73
1,268
11,712
7
3.36
1,142
12,854
8
3.02
1,027
13,881
9
2.72
925
14,806
10
2.45
833
15,639
13. Owners of working interests generally have the right to develop and exploit oil and natural gas on the leased property and are responsible for the cost of development and operation of wells that are drilled on the property.↩
14. There is no direct evidence of Allen's cost for the leases. However, in some correspondence between Allen and R & R, there is an indication that Allen was not making a large profit from the lease bonus payments.↩
15. It is unclear how this amount was calculated.↩
16. Based on this record, it appears that Kuster's meeting with Coopers & Lybrand was perfunctory and that neither an independent analysis of the Balboa program was made nor additional information requested or assurances sought.↩
17. Meserve also referred Coastal and MacLean to Osterhout.↩
18. Mac En was owned by MacLean and Enroth.↩
19. During trial, it was never adequately explained how Balboa had the funds to commence a second drilling program with Mac En and Coastal and obligate itself to the payment of drilling and operating costs.↩
20. The facts are substantially similar to those of the Balboa program. Therefore, the recital of facts is limited to those which differ from the Balboa program.↩
21. The price assumptions utilized in the report were provided by Coastal.↩
22. ↩
Reserves: David Harmon Reserves: Coopers & Lybrand
Well
Gas (MCF)
Oil (bbls)
Gas (MCF)
Oil (bbls)
1
19,488
39,003
23,002
28,752
2
14,575
26,832
16,136
20,170
3
6,194
21,893
10,970
13,713
23. It is not clear whether Martin, Davis, & Deacon was the successor firm of Meserve, Mumper, & Hughes or a spin-off firm.↩
24. Apparently the leases had not been properly recorded.↩
25. Mr. Teeple has a Bachelor of Science Degree and a Juris Doctor from Ohio State University. Currently, he is a member of the law firm Geiger, Teeple, Smith & Hahn, and has been involved in oil and gas matters since 1960.↩
26. Indeed, this record is devoid of evidence of other oil programs (save Balboa). A compelling record might have contained evidence of other profitable↩ programs similarly structured, if indeed, any exist.
27. At trial, Osterhout testified as follows: Court: Have any investors come to you and tried to figure out some way to get out of this liability that they have to MacLean? Osterhout: No. Court: Has any -- has MacLean, to your knowledge, been negotiating with any of these people? Osterhout: Not to my knowledge. Court: Have they brought suit? When is the obligation on Balboa due? Osterhout: I believe it was -- it might have been -- I'm not sure. It was -- could have been 1990, 1992. Court: Weren't you -- didn't you assign -- didn't you invest at all? Osterhout: Yes. Court: So, aren't you on the hook for some of this? Osterhout: Yes. Court: How much are you on the hook for? Osterhout: I don't recall. It's -- Court: You don't know? You don't know how much you owe somebody out there? Osterhout: I would guess it's, you know, it's several hundred thousand dollars.↩
28. The annual survey of oil price projections, compiled by the Society of Petroleum Evaluations Engineers, was prepared under the auspices of Dr. Laszlo K. Nemeth, respondent's expert witness. Both parties cite this report.↩
29. Nominal prices are those that consumers face in the marketplace. Real prices are nominal prices adjusted to account for the effect of inflation, and, for purposes of the report cited, they are expressed in 1980 dollars.↩
30. The final paragraph of the summary of the report states: The Energy Information Administration's approach to projecting energy consumption, supplies, and prices is structured to consider future uncertainty by developing three energy projections based on different assumptions about future world oil prices. However, all possible future events cannot be incorporated into these projections. In this spirit, readers of this volume should recognize its limitation and its value. Individual projections should not be taken out of context and treated as if they are certain.↩
31. Sec. 6661(a) is not applicable to the return for the fiscal year ending June 30, 1980. Accordingly, respondent's determination is in error to that extent.↩